[Cite as *State v. Couch*, 2026-Ohio-609.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 2024CA0069-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| STEVEN L. COUCH | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 2023CR0124 |

DECISION AND JOURNAL ENTRY

Dated: February 23, 2026

CARR, Judge.

{¶1} Defendant-Appellant Steven L. Couch appeals the judgment of the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2} In February 2023, an indictment was filed charging Couch with one count of forgery. The charge related to allegations that, in November 2022, Couch forged a check of his step-grandfather's ("Grandfather"). In June 2023, a supplemental indictment was filed charging Couch with theft from a person in a protected class in violation of R.C. 2913.02(A), (B)(3). Couch was alleged to have stolen a tractor, toolbox, tools, and trailer from Grandfather's property after eviction proceedings had been instituted against Couch, who had been living at Grandfather's property. In July 2023, another supplemental indictment was filed charging Couch with an additional count of theft from a person in a protected class in violation of R.C. 2913.02(A)(1),

(B)(3). This charge involved other items, which were alleged to be stolen from Grandfather's property after the eviction proceedings began.

{¶3} The matter proceeded to a jury trial. The jury found Couch not guilty of forgery, but guilty of the remaining two counts. The matter proceeded to sentencing, and subsequently, a restitution hearing. Couch's two prior appeals were dismissed due to the absence of a final appealable order. *See State v. Couch*, 9th Dist. Medina No. 2024CA0023-M (May 1, 2024); *State v. Couch*, 9th Dist. Medina No. 2024CA0049-M (July 24, 2024). Couch now appeals again, raising three assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BY DETERMINING THAT THE ALLEGED VICTIM WAS COMPETENT TO TESTIFY AT DEFENDANT-APPELLANT'S CRIMINAL TRIAL, WHERE THE PROBATE COURT HAD RECENTLY DETERMINED THE ALLEGED VICTIM TO BE INCOMPETENT, DUE TO HIS SUFFERING FROM AL[Z]HEI[M]ER'S DISEASE/DEMENTIA, AND HAD APPOINTED A GUARDIAN TO REPRESENT HIM.

{¶4} Couch argues in his first assignment of error that the trial court abused its discretion in determining that Grandfather was competent to testify when he had been determined to be incompetent by the probate court and had a guardian appointed for him.

{¶5} "A trial judge, being in the best position to view and hear a witness and being in the best position to determine the witness' understanding of the events in question and his understanding of the nature of an oath, is to be given wide discretion in determining that witness' competence to testify." *State v. Bradley*, 42 Ohio St.3d 136, 141 (1989).

{¶6} First, we note that "[t]he criteria by which a trial court must determine whether a witness is competent to testify as a witness are substantially different from the criteria by which a

court may decide to appoint a guardian due to one's incompetence." *State v. Marshall*, 2010-Ohio-5160, ¶ 13 (2d Dist.). R.C. 2111.01, the definition section in the Chapter of the Ohio Revised Code concerning guardians and conservatorships, defines incompetent as, inter alia,

> [a]ny person who is so mentally impaired, as a result of a mental or physical illness or disability, as a result of intellectual disability, or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property or fails to provide for the person's family or other persons for whom the person is charged by law to provide[.]

R.C. 2111.01(D)(1).

{¶7} That definition does not apply in determining the competency of a witness to testify in court. *See generally Marshall* at ¶ 13. R.C. 2317.01 provides that "[a]ll persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." "If the witness is of unsound mind or under the age of ten, the proponent of the witness bears the burden to establish certain indicia of competency." *State v. Cepec*, 2016-Ohio-8076, ¶ 66 (referring to similar language in former Evid.R. 601). The phrase "[o]f unsound mind" indicates "that the person lacks the relevant mental capacity." R.C. 1.02(C). "A person, who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind." *Bradley* at 140-141, quoting *State v. Wildman*, 145 Ohio St. 379 (1945), paragraph three of the syllabus. "This Court has further held that some unsoundness of mind does not render a witness incompetent if the witness otherwise possesses the three basic abilities required for competency: the ability to accurately observe, recollect, and communicate that which goes on around him or her." (Internal quotations and citations omitted.) *State v. Estright*, 2009-Ohio-5676, ¶ 26 (9th Dist.).

{¶8}     Evid.R. 601(A) provides that "[e]very person is competent to be a witness except as otherwise provided in these rules."

A person is disqualified to testify as a witness when the court determines that the person is any of the following:

(1) Incapable of expressing himself or herself concerning the matter as to be understood, either directly or through interpretation by one who can understand him or her;

(2) Incapable of understanding the duty of a witness to tell the truth;

. . .

Evid.R. 601(B).

{¶9}     Prior to Grandfather's testimony, defense counsel questioned Grandfather's competency to testify. Defense counsel indicated that Grandfather had been declared incompetent by the probate court and his step-granddaughter ("Granddaughter") was appointed as guardian. Defense counsel believed that Grandfather had dementia and/or Alzheimer's disease. Before Grandfather testified, the trial court and counsel for the parties questioned Grandfather under oath, outside the presence of the jury. Grandfather, who was 80 years old at the time of trial, knew his birthday, and understood why he was in court. He told the trial court that he was there to testify about his "tools and stuff." When asked if he understood what it meant to tell the truth, Grandfather responded that he had "been doing it all [his] life." Grandfather recognized that when he was put under oath, he had an obligation to tell the truth. Grandfather indicated that he recalled the events and circumstances pertaining to the case. Grandfather was able to identify Couch, knew Couch was his grandson, and understood that Couch was the one facing charges. Grandfather listed certain items that he believed were taken. When Grandfather was asked when he last spoke to Couch, he indicated at a hearing. Grandfather clarified that they did not speak at the hearing and

that he thought the hearing was two years ago in November. Grandfather thought it was related to the eviction and thought Couch was there.

{¶10} At the end of the voir dire, the trial court determined Couch was competent to testify. Thereafter, Grandfather testified.

{¶11} On appeal, Couch argues that Grandfather's subsequent testimony, along with other evidence, and the jury's verdict demonstrates that he was incompetent. For example, Couch points to the fact that Grandfather testified that he did not sign the check made out to Couch, which was the subject of the forgery count, but yet, another witness testified to seeing Grandfather sign the check, and ultimately, the jury found Couch not guilty of that charge. Notably, that testimony was not available for the trial court to consider at the time it ruled on Grandfather's competency, nor would the trial court have been able to consider how the jury would ultimately resolve the disputed evidence as to the check. Essentially, Couch seems to believe that the trial court, and this Court, should have continued to reevaluate Grandfather's competency throughout the trial and even after the jury's verdict. Couch has not convinced this Court that that is appropriate. While defense counsel did raise the issue of competency after Grandfather's testimony, much of the other testimony Couch relies on had not occurred and certainly the jury had not yet deliberated.

{¶12} We cannot say that Couch has demonstrated that the trial court abused its discretion in ruling that Grandfather was competent to testify at trial. The voir dire touched upon the appropriate topics and issues. Further, based upon the voir dire, it was reasonable for the trial court to conclude that Grandfather was able to correctly state matters that have come within his perception as to the relevant issues and that he appreciated and understood the importance and nature of the oath. *See Bradley*, 42 Ohio St.3d at 140-141. In addition, Couch has not shown that the trial court's failure to alter its decision as to competency was an abuse of discretion;

Grandfather testified fairly extensively about the matters at issue and his testimony was not of such a nature to render the trial court's conclusion unreasonable, arbitrary, or unconscionable.

{¶13}  Couch's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

THE EVIDENCE PRESENTED BY THE STATE OF OHIO WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT OF "GUILTY" AS TO COUNTS II AND III, THE CHARGED FELONY OFFENSES OF THEFT IN VIOLATION OF R.C. 2913.02(A)(1)(C)(3), WHERE THE ESSENTIAL ELEMENTS OF "PURPOSE TO DEPRIVE THE OWNER OF PROPERTY" AND "WITHOUT THE CONSENT OF THE OWNER" WERE NOT PROVEN BEYOND A REASONABLE DOUBT.

{¶14}  Couch argues in his second assignment of error that the jury verdicts in counts two and three were based upon insufficient evidence.  Specifically, Couch asserts that he did not have the purpose to deprive Grandfather of any property or that Couch acted without consent.

{¶15}  When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶16}  With respect to count two, Couch was charged with violating R.C. 2913.02(A), (B)(3).[1]  As to count three, Couch was alleged to have violated R.C. 2913.02(A)(1), (B)(3).

---

[1] While count two references R.C. 2913.02(A) generally, which contains five subsections, the text of the indictment includes only the provisions of (A)(1)-(A)(3).  Thus, our discussion will focus on those provisions.

{¶17} R.C. 2913.02(A) provides in relevant part:

No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception[.]

{¶18} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶19} The trial testimony and evidence will be summarized below. The alleged forgery will be discussed only to provide context for the rest of the events.

{¶20} Prior to Grandfather's wife's death, Couch moved into Grandfather's property to help Grandfather and his wife. Couch and Granddaughter are siblings. Grandfather's property included three outbuildings, one of which was a garage. Couch would take Grandfather and his wife to doctor's appointments and drive them where they needed to go. Couch also had a car repair business that he ran out of Grandfather's garage. Grandfather helped with the car repair. Both Grandfather and Couch had a large number of tools that were intermingled. The outbuildings were full of tools and other items.

{¶21} Grandfather, who was 80 years old at the time, had many health issues. Among them, he was diagnosed with dementia/Alzheimer's in 2021. According to Granddaughter, Grandfather remembers some things really well and not others. For example, he might get people's

names confused but at the same time remember his tools well. Ultimately, Granddaughter became Grandfather's power of attorney and his guardian.

{¶22} Grandfather's wife passed away in January 2022. Granddaughter took over handling Grandfather's bills in October 2022. In November 2022, Granddaughter asked Grandfather about a check that was made out to Couch. Grandfather said he did not write that check and confirmed the same during his testimony. Granddaughter asked Grandfather what he wanted to do about the check and he said he wanted to press charges against Couch. Granddaughter testified that Grandfather told her that he warned Couch once already not to take anything from him. The police were called, and, according to Granddaughter, Grandfather did the talking; however, Grandfather testified he did not talk to the police. Granddaughter also spoke to the police. The police provided them with options. Grandfather looked at Granddaughter as if to ask what he should do, and Granddaughter told him it was his choice. Grandfather opted to proceed with the charges.

{¶23} Grandfather was hospitalized on more than one occasion and later was placed in a nursing home, where he was at the time of the trial. Grandfather was not happy to be in the nursing home and wanted to be at home. Both Granddaughter and Couch had access to Grandfather's property as they both had keys. At one point, Granddaughter came to the property after Grandfather was in the nursing home and could not get in; Granddaughter believed that Couch had changed the locks. When Granddaughter confronted Couch about this, he told her that she could not come and go as she pleased, and she needed to call before she came over. Granddaughter talked to Grandfather about the situation and the eviction process was instituted in January 2023, according to Granddaughter. Grandfather was involved in the eviction proceedings, attended hearings, and met with the attorney. When Couch had not moved out, a writ of restitution was

issued May 4, 2023, and a notice was put out that day at the property. Couch then had until around May 14, 2023, to leave. At that time, Granddaughter went out to the property. Deputies from the Sheriff's Office and Couch were there. Couch was still removing items from the property. Granddaughter went through the outbuildings and noticed things missing. The outbuildings were nearly empty when they had been full. She noticed in particular that Grandfather's tractor and trailer were missing. Granddaughter asked Couch about it, and he claimed that the items were there when Couch shut the doors, which was only minutes before. Couch said somebody must have stolen them. Couch left with a box truck full of stuff and Grandfather's trailer. Granddaughter told the deputy that she wanted to press charges, but the officer told her she had to take it up in eviction court. The judge in the eviction proceeding held a hearing and awarded damages but did not include the missing items. Granddaughter then sought to have a criminal case opened.

{¶24} Grandfather testified that Couch did not have permission to change the locks. According to Grandfather, Couch did have permission to use and borrow the items at issue in the proceedings while Couch was living on the property; however, Couch did not have permission to take the items after Couch was evicted. Grandfather discovered items were missing at some point when he returned to the property. At trial, he was able to identify several items that were later recovered as belonging to him, including the tractor, trailer, and certain toolboxes. Other items, Grandfather was not able to identify as his own, even though other testimony evidenced that some of the items may have in fact been Grandfather's. It was noted that Grandfather often engraved his tools with his initials. Grandfather expressed being disappointed in Couch because he stole Grandfather's things. Grandfather indicated that Granddaughter took Grandfather to see an

attorney in order to write Couch out of the will. Granddaughter acknowledged taking Grandfather to an attorney but testified that she saw the will and that Couch was an equal beneficiary under it.

{¶25} On May 31, 2023, Deputy Charles Johnson with the Medina County Sheriff's Office reported to Grandfather's home after Granddaughter had reported that items were stolen from it. Deputy Johnson also spoke to Grandfather on the phone, but not that day. The matter was passed on to Detective Keith Curtin.

{¶26} Detective Curtin went out to a property in Norton where an elderly man lived. That elderly man, who acknowledged having dementia, informed Detective Curtin that Couch was staying in the camper on the property. However, at trial, the man denied that Couch was staying there and indicated that Couch's children were staying there and the man watched them when Couch was not there. Detective Curtin had a list of items that Granddaughter and Grandfather alleged were stolen, and he asked the elderly man about the items. The man took Detective Curtin to the tractor, and Detective Curtin then noticed a toolbox. Detective Curtin asked whose it was, and the man indicated it was Couch's. There was also a trailer in the front yard, but the man kept changing the story as to whose trailer it was, and the license plate came back as belonging to someone else. The elderly man testified that the license plate was his cousin's and he had borrowed it from his cousin because the trailer's plate expired. The man indicated the trailer was used to help Couch move items off of Grandfather's property; some were brought to the elderly man's place and some were taken to a storage facility. The man testified that the items belonged to Couch and Grandfather and that Couch did not intend to keep Grandfather's property. Ultimately, Detective Curtin had the tractor and toolbox taken to an impound lot and Granddaughter had to pay to retrieve the items from there.

{¶27}   Before Detective Curtin left, he had the man call Couch and Detective Curtin spoke to Couch. The conversation was recorded and played for the jury. Couch indicated that his tools and Grandfather's tools were mixed together, and he had not gone through them. Couch mentioned waiting for a court date to deal with the items; although the record supports that Couch failed to appear at one of the eviction court proceedings. Couch complained about having an inadequate amount of time to go through everything in light of his other responsibilities. Couch acknowledged the tractor and toolbox were Grandfather's but said he could not return them because he could not go to Grandfather's property or talk to Grandfather due to a no-contact order being in place. Couch also expressed concern about some of his tools being in the toolbox. Couch denied knowledge of the trailer or any storage unit. Couch believed that Granddaughter was just being petty.

{¶28}   Later, Detective Curtin went out and spoke to the owner of the plate found on the trailer at the elderly man's property. The owner was the elderly man's cousin. The owner of the plate did not give permission for the plate to be used on Grandfather's trailer. When the owner was told it was being used on that trailer, he went over and took the plate back. After Detective Curtin spoke to the owner, Detective Curtin went and recovered the trailer.

{¶29}   At some point, Detective Curtin received a call from Couch's ex-girlfriend, Jessica. Jessica informed Detective Curtin that she had storage units that Couch had wanted her to get when he was evicted and they were still dating. During an interview, which was played for the jury, Jessica expressed concern that she might get in trouble if the storage units contained stolen items.

{¶30}   At trial, Jessica testified that Granddaughter told Jessica she could be charged with receiving stolen property and that is why Jessica contacted the police. Jessica denied that any items were stolen. Granddaughter denied threating Jessica in any manner and instead asserted that Jessica was the one that reached out to Granddaughter. Jessica was not very forthcoming in her

trial testimony and admitted that she did not want to be at the trial testifying. While she acknowledged Couch's father had threatened her in the past, she denied that he threatened her over testifying in court. Nonetheless, she admitted that she requested an escort to and from the courthouse. Detective Curtin also testified that Jessica had shown him some text messages from Couch's father and expressed concern that Couch's father was going to try to get back at her.

{¶31} Detective Curtin asked Jessica to meet him at the storage units to go through them and they set a date to do so. When they met, Granddaughter was also in attendance. Jessica signed a consent to search form, although at trial she denied that she did so and testified that she only had given verbal consent. There was so much stuff that Jessica and Granddaughter agreed that Granddaughter would come back with Grandfather and others and go through and figure out what items were Grandfather's. When Granddaughter and Jessica went back to the storage units with Grandfather and others, Detective Curtin was not present. Grandfather went around identifying items that belonged to him. According to Granddaughter, this included a heater with his name on it, a go-kart, a cherry picker, power tools, jacks, other tools, a canister set, pots and pans, and a mixer, among other items. Jessica testified that Grandfather also identified as his some items that belonged to her or items that she had gifted to Couch.

{¶32} Two witnesses also testified for the defense. Grandfather's and his wife's friend and housekeeper testified concerning the check that formed the basis of the forgery charge. The housekeeper testified that Grandfather did sign the check as she saw him do it. That check was for expenses related to an out-of-state funeral that Couch took Grandfather to. Grandfather also made a check out to the housekeeper that day. She testified that Couch and Grandfather were very close and that they were like a team in their work repairing cars. Grandfather did not want to be in the nursing home and even called her and asked her to bring him to his house.

{¶33} Couch's father also testified. During his testimony he seemed to acknowledge previously threatening Jessica but denies it had anything to do with this matter. Couch's father also denied that he would ever threaten physical violence against a woman, but did express anger and frustration that Jessica called the police on Couch during their relationship. Couch's father agreed that Grandfather's and Couch's tools were intermingled and claimed Couch would not have kept Grandfather's tools as Couch had enough of his own.

{¶34} After reviewing the entire record in a light most favorable to the prosecution, we cannot say that Couch has demonstrated that the guilty verdicts were supported by insufficient evidence. There was evidence presented that Couch did not have permission to take the items after he was evicted from Grandfather's property. There was also evidence that Couch was frustrated with the situation at hand. Couch changed the locks on the property after he was accused of forging a check, which he was not permitted to do, and then, during the eviction process, removed nearly all the items from the outbuildings on Grandfather's property even though a substantial portion of the items belonged to Grandfather. When questioned by police, Couch also denied knowledge of Grandfather's trailer which was found on the property where he was staying and denied knowing about the storage units which he asked Jessica to rent and where numerous items belonging to Grandfather were found. In addition, when the trailer was located, it had a plate registered to someone else on it. Thus, many of Couch's actions could have been viewed as deceptive and also evidence a purpose to deprive Grandfather of his belongings.

{¶35} Couch's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE JURY VERDICTS OF "GUILTY" AS TO COUNTS II & III, THE CHARGED FELONY OFFENSE OF THEFT IN VIOLATION OF R.C. 2913.02(A)(1)(C)(3), WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶36} Couch argues in his third assignment of error that his convictions are against the manifest weight of the evidence. Couch essentially reiterates the same arguments he made with respect to the sufficiency of the evidence, which we have previously addressed above.

{¶37} In reviewing whether verdicts are supported by the weight of the evidence,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Id.*

{¶38} After a thorough and independent review of the evidence, we cannot say that Couch has demonstrated that the jury lost its way in rendering the verdicts it did. "We are mindful that the jury is free to believe all, part, or none of the testimony of each witness. This Court will not overturn a conviction on a manifest weight challenge only because the jury found the testimony of certain witnesses to be credible." (Internal quotations and citations omitted.) *State v. Carter*, 2024-Ohio-5295, ¶ 22 (9th Dist.). Moreover, the jury was in the best position to make credibility determinations. *Id.* at ¶ 24. Couch has not demonstrated that the jury's resolution resulted in a manifest miscarriage of justice.

{¶39} Couch's third assignment of error is overruled.

III.

{¶40} Couch's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.


DONNA J. CARR
FOR THE COURT


FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

CHRISTINE RUSSO, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and STEFANIE H. ZARANEC, Assistant Prosecuting Attorney, for Appellee.